UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMES BUTLER,

                    Plaintiff,

        - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
13 CV 352 (DRH)

**APPEARANCES:**

**CHRISTOPHER J. BOWES, ESQ.**
Attorney for Plaintiff
55 Cobblestone Drive
Shoreham, New York 11786

**LORETTA E. LYNCH**
**UNITED STATES ATTORNEY**
Attorney for Defendant
610 Federal Plaza
Central Islip, New York 11722
By:    Kenneth M. Abell, Assistant U.S. Attorney
Of Counsel:    Stephen P. Conte, Regional Chief Counsel- Region II
                Rebecca H. Estelle, Assistant Regional Counsel
                Office of the General Counsel
                Social Security Administration



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
☆
DEC -4 2014
☆
LONG ISLAND OFFICE

**HURLEY, Senior District Judge:**

    Plaintiff James Butler ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner") that denied his claim for disability benefits.  Presently before the Court are the

Commissioner's motion and Plaintiff's cross-motion for judgment on the pleadings.  For the

reasons discussed below, the Commissioner's motion is denied and Plaintiff's cross-motion is

granted.

## BACKGROUND

### I.   *Procedural Background*

Plaintiff applied for Social Security Disability benefits on January 21, 2010, alleging that

he had become disabled as of December 30, 2007 due to arthritis of his left knee. (Transcript

(hereafter "Tr.")[1] 83, 95.) Plaintiff's application was denied on April 19, 2010. (Tr. 33-44.)

Subsequently, Plaintiff filed a request for a hearing before an administrative law judge ("ALJ").

(Tr. 45-54.) This request was granted, and, on May 23, 2011, Plaintiff and his attorney appeared

for a hearing before ALJ Joseph Faraguna. (Tr. 22-28, 61.) The hearing lasted approximately

five minutes. (Tr. 24, 28.) While the ALJ suggested that there was a lack of medical evidence to

establish disability prior to June 30, 2009, the last date for which Plaintiff was insured for

disability benefits, Plaintiff's attorney stated that the actual date last insured was later than June

30, 2009. (Tr. 24-26.) Plaintiff's attorney further argued that even assuming that June 30, 2009

was the correct date last insured, the record evidence supported a finding of disability as a result

of Plaintiff's degenerative joint disease. (Tr. 26.) Plaintiff did not testify at the hearing. (Tr. 22-

28.) The hearing closed with the ALJ's statement that he would review the file and "consider

[his] options." (Tr. 26.) On July 14, 2011, the ALJ rendered a written decision finding that

Plaintiff was not disabled within the meaning of the Social Security Act (the "SSA"). (Tr. 8-19.)

Plaintiff requested a review of the ALJ's decision by the Appeals Council ("AC"), and

submitted with his appeal an additional report of an MRI of his right knee, dated February 3,

2012, to further support his claim. (Tr. 5-6, 158-77.) However, on November 16, 2012, the AC

denied Plaintiff's request for review, and deemed the ALJ's decision to be the final decision in

Plaintiff's case. (Tr. 1-4.)

---

[1] References to "Tr." are to the Administrative Record filed in this case.

## II. *Factual Background*

### A. *General Information*

Plaintiff was born on January 12, 1962. (Tr. 83.) He was two weeks shy of forty-six

years of age as of December 30, 2007, the date of the onset of his alleged disability, and was

forty-nine years old on the date of the ALJ's decision. Plaintiff speaks, reads and writes in

English, and has a college education. (Tr. 94, 99.)

Plaintiff worked as a firefighter from September 1987 through June 2000. (Tr. 101, 103.)

In June 1997, Plaintiff injured his left knee while working. (Tr. 95.) Plaintiff's injuries included

a tear on the inside and outside of his knee, arthritis, and shifting of the knee cap. (Tr. 95.)

Surgery was performed on Plaintiff's knee in September 1998, and Plaintiff returned to work,

light duty, approximately six to eight weeks later. (Tr. 95.) Plaintiff remained on light duty until

he retired in 2000. (Tr. 95, 97.) He did not work from 2000 to 2002. (Tr. 95.) However, in

2003 to 2004, Plaintiff worked as a manager of his friend's restaurant/bar, and, in 2005, he

opened his own bar and worked there until December 2007. (Tr. 95, 103.)

According to Plaintiff's Disability Report, his injuries first interfered with his ability to

work in June 2007, and he ultimately stopped working because of his injuries on December 30,

2007. (Tr. 95.) Plaintiff claims that he is unable to sit, stand, lift or carry heavy objects, or walk

for lengthy periods of time without being in pain because of his injuries, and that those activities

cause him unbearable pain. (Tr. 95.) Furthermore, Plaintiff's job as a firefighter requires him to

stand, walk, climb, and carry or lift heavy objects all day, and, thus, he is unable to perform his

job. (Tr. 95.) Plaintiff filed another Disability Report upon his appeal in which he reported that

since the time he had completed his prior Disability Report, his condition had not changed nor

had he experienced any new physical limitations as a result of his injuries. (Tr. 134.)

3

**B.**    *Medical Evidence*

### 1.    Medical Evidence Prior to December 30, 2007

On September 21, 1998, Plaintiff underwent surgery to repair a torn left medial meniscus and traumatic changes to the left medial compartment. (Tr. 212-19.)

### 2.    Medical Evidence for the Relevant Period (December 30, 2007 through June 30, 2009)

In June 2008, Plaintiff sought treatment with Bernhard Sengstock, a chiropractor, following a 2008 motor vehicle accident. Plaintiff complained of neck, headache, upper back and left shoulder pain. He also described radicular symptoms in the left upper extremities, including pain, altered skin sensation, and weakness. (Tr. 256.) Plaintiff reported that he had not been receiving active treatment and had been asymptomatic prior to the motor vehicle accident. The chiropractor's examination revealed hypertonicity of the paraspinal area, restricted range of motion in the thoracic and cervical spine, and restriction in the left shoulder. Plaintiff was diagnosed with cervical intervertebral disc herniation, cervical radiculopathy, cervical-thoracic region dysfunction, and lateral derangement of the left shoulder. It was recommended that Plaintiff receive chiropractic and massage treatment, and an evaluation of his left shoulder by a physiatrist. Plaintiff was rated partially disabled, given a guarded prognosis, and his injuries were deemed causally related to the motor vehicle accident. (Tr. 256.)

Plaintiff was treated by a licensed massage therapist from June 6, 2008 to July 21, 2008. (Tr. 262-70.) He complained of shoulder, neck, and upper and middle back pain. (Tr. 262-70.) Tension and hypertonicity were observed in those areas. (Tr. 262-70.) Plaintiff was also evaluated by a physical therapist on June 9, 2008. (Tr. 271-72.)

On July 9, 2008, Plaintiff underwent MRIs of the cervical spine and left shoulder. (Tr. 259-61.) The MRI of the cervical spine revealed reversal of cervical lordosis with multilevel

4

posterior disc displacements and joint hypertrophy causing spinal and foraminal stenosis bilaterally. (Tr. 260.) The MRI of Plaintiff's left shoulder revealed mild degenerative changes with mild supraspinatus tendinosis, but no evidence of a labral or rotator cuff tear. (Tr. 261.) Plaintiff also underwent an MRI of his left elbow on July 16, 2008, which MRI revealed trace elbow joint effusion, but no evidence of a fracture or ligamentous injury. (Tr. 258.)

### 3. Medical Evidence after the Date Last Insured (Post- June 30, 2009)

On September 23, 2009, Plaintiff saw Dr. Keefer at Orlin & Cohen Orthopedic Associates LLP ("OCOA") for a consultation and check-up regarding his claim for Social Security disability benefits. (Tr. 205-11.) Plaintiff reported pain in his spine/back, neck, left shoulder and left knee. (Tr. 205-06.) He characterized his pain as dull/aching, tight and throbbing. (Tr. 205.) Plaintiff stated that his pain had been constant, and present for ten years. (Tr. 205.) He also reported that his pain worsened when stretching, stirring, standing, twisting, walking, bending, squatting, kneeling, lifting, exercising, lying in bed, coughing, using the stairs, and with warmth and cold. (Tr. 210.) Plaintiff denied, however, suffering from, *inter alia*, stiffness, localized tingling, weakness, aches, burning, cold limbs, difficulty walking, sleep disturbance, numbness, pins and needles, swelling or bruises. (Tr. 210.) Plaintiff also denied receiving any current treatment for his condition. (Tr. 208.) Plaintiff reported that he was living alone. (Tr. 207.) The examination revealed a normal general appearance with intact coordination and intact sensation in Plaintiff's arms and legs. (Tr. 206.) The examination of Plaintiff's left knee revealed guarding that limited the examination, crepitation, mild effusion, instability to varus stressing and medial joint line tenderness. (Tr. 206.) In addition, an x-ray of Plaintiff's left knee showed degenerative change. (Tr. 206.) Plaintiff was diagnosed with left

knee pain and osteoarthritis. (Tr. 206.) A hinged knee brace, physical therapy, "NSAIDS" and left knee Supartz injections were recommended. (Tr. 206.)

Plaintiff continued to receive treatment at OCOA for his left knee during 2009, 2010 and 2011. (Tr. 179-203, 227-36, 249-51.) On December 2, 2009, Plaintiff was given a Supartz injection in his left knee. (Tr. 179-81, 190.) At that time, Plaintiff complained that his pain was constant, affected his ability to sleep, and was worse while sitting, standing, walking, squatting, kneeling and using the stairs. (Tr. 180, 190.) Plaintiff reported that his problem had been present for six years, and described his pain as burning, dull/aching, shooting and throbbing. (Tr. 190.) In addition, Plaintiff stated that he suffered from back and joint pain. (Tr. 190.) Plaintiff received additional Supartz injections to his left knee on December 16, 2009, December 23, 2009, January 6, 2010, and January 13, 2010; however, he reported that the injections did not help with his pain. (Tr. 182-85, 192-200.) A physical examination on February 24, 2010 showed that Plaintiff's gait was antalgic. (Tr. 200-01.) Although Plaintiff was deemed a candidate for knee replacement surgery, it was suggested that he postpone surgery as long as possible because of his young age. (Tr. 201.) It was also commented that Plaintiff qualified as fully disabled because of his knee. (Tr. 201.)

On February 25, 2010, Plaintiff was examined by Dr. Mitchell Goldstein at OCOA to discuss the possibility of a total knee replacement. (Tr. 202-03.) It was observed that Plaintiff had injured his left knee in the line of duty in 1998, had reinjured it in 1999, and had surgery on his left knee in 1999. (Tr. 202.) It was further observed that Plaintiff retired in 2000, had attended physical therapy, had tried Vicoden, had been given a series of Supartz injections that were unhelpful, and was taking "NSAI[Ds]." (Tr. 202.) An examination of Plaintiff revealed mild quad and calf atrophy, an active range of motion from five to eighty degrees with pain, and

6

tenderness of the patella and medial joint line. (Tr. 202.) Knee testing revealed positive results for patella grinding and crepitus with ROM, and McMurray testing was positive. (Tr. 202.)

Beginning in March 2010, Plaintiff saw a rehabilitative medicine specialist, Dr. Daniel Shapiro, for his left knee. (Tr. 237-47, 253-55.) Plaintiff complained of left knee pain, swelling and buckling. (Tr. 241.) A physical examination on March 24, 2010 showed that Plaintiff ambulated with an antalgic gait, limping on the left side, and had difficulty walking heel to toe and tandem walking. (Tr. 241.) It was observed that Plaintiff's left knee was swollen and there was some atrophy of the vastus medialis muscle. (Tr. 241.) In addition, prepatella swelling and crepitus of range of motion of the knee and patella were observed. (Tr. 241.) Loss of range of motion of the left knee and loss of extension were noted. (Tr. 242.) McMurray Sign, Apley Sign, Gaenslen Sign and SI Joint Stress tests were positive. (Tr. 242.) Plaintiff failed the Krause Weber tests and had loss of normal rhythm of pelvisacral bending and extension. (Tr. 242.) Plaintiff was diagnosed with lumbosacral radiculopathy as a result of his altered gait, and internal derangement of the left knee. (Tr. 242.) It was further noted that Plaintiff was still too young to have left knee replacement surgery. (Tr. 242.)

Plaintiff returned to Dr. Shapiro on June 2, 2010 for a follow up visit. (Tr. 240, 243.) Plaintiff again complained of left knee and lower back pain. (Tr. 240.) A physical examination of Plaintiff indicated that Plaintiff walked with an antalgic gait, limping on the left side. (Tr. 240.) Plaintiff had crepitus of range of motion, atrophy of the left vastus medialis muscle, and positive results under the McMurray Sign, Apley Grinder Signs and Anterior Drawer Sign tests. (Tr. 240.) Plaintiff was again diagnosed with internal derangement of the left knee and lumbosacral radiculopathy. (Tr. 240.)

On August 26, 2010, Plaintiff was evaluated by Dr. Goldstein at OCOA. (Tr. 233.) An examination of Plaintiff's left knee revealed varus alignment, mild quad and calf atrophy, and tenderness of the patella and medial joint line. (Tr. 234.) Knee testing also revealed positive results for patella grind, McMurray testing and crepitus with ROM. (Tr. 234.) Plaintiff was diagnosed with knee pain, a limp and osteoarthritis of the knee. (Tr. 234.)

Plaintiff returned to Dr. Shapiro on September 15, 2010 with complaints of knee pain. (Tr. 239.) It was observed that the knee injections did not seem to help, and that Dr. Goldstein was considering repeat surgery. (Tr. 239.) Plaintiff continued to exhibit an antalgic gait, limping on the left. (Tr. 239.) He experienced tenderness to palpation over the medial joint line, had crepitus of range of motion, and his hamstrings and quadriceps were weak. (Tr. 239.) Plaintiff was diagnosed with internal derangement of the right knee. (Tr. 239.)

On November 17, 2010, Plaintiff visited Dr. Goldstein at OCOA with complaints of pain in his left knee, lower back, and right knee. (Tr. 231.) Plaintiff described his left knee pain as burning, dull/aching, sharp, shooting, stabbing and throbbing, and stated that his problem had been present for three years. (Tr. 231.) Plaintiff stated that the pain affected his sleep and that he had difficulty with the activities of daily living. (Tr. 231.) A knee examination showed mild quadricep and calf atrophy. (Tr. 232.) An x-ray showed marked medial narrowing in his left knee. (Tr. 232.) Active range of motion in his left knee was from five degrees to eighty degrees. (Tr. 232.) In addition, an examination of Plaintiff's lumbar revealed pain and diminished extension, flexibility, rotation and lateral bending. (Tr. 232.) An x-ray of Plaintiff's lumbar spine showed straightening consistent with spasm, disc space narrowing and facet arthropathy. (Tr. 232.) Plaintiff was diagnosed with knee pain, osteoarthritis of the knee, a limp, lumbar

8

sprain, lumbago, sciatica, pelvic sprain, trigger point with back pain, and degenerative disc disease. (Tr. 232.)

An MRI of Plaintiff's lumbar spine, performed on December 2, 2010, revealed a reversal of the normal upper-to-mid lumbar lordosis, asymmetric left foraminal disc bulging, and bony riding resulting in likely impingement on the left exiting L5 nerve root at L5-S1 without compression. (Tr. 224.) The MRI also revealed a right foraminal herniation at L4-L5 encroaching on the right exiting L4 nerve root. (Tr. 224.) No fracture or central stenosis was evident. (Tr. 224.)

Plaintiff returned to OCOA for a follow up visit on December 8, 2010. (Tr. 229-30.) He complained of left knee, right knee and lower back pain. (Tr. 229.) It was assessed that Plaintiff had degenerative disc disease, knee pain, a limp, lumbago, lumbar sprain, osteoarthritis of the knee, pelvic sprain, sciatica, trigger point with back pain, and lumbar herniated nucleus pulposus. (Tr. 230.)

Dr. Shapiro examined Plaintiff on December 15, 2010. (Tr. 238.) Plaintiff continued to complain of left knee and lower back pain, as well as buckling of his left knee. (Tr. 238.) The examination revealed an absent ankle jerk on the left. (Tr. 238.) Plaintiff failed the Krause Weber tests and had lost the normal rhythm of pelvisacral extension and bending. (Tr. 238.) SI Joint Stress and Gaenslen Sign tests were positive. (Tr. 238.) It was observed that Plaintiff walked with an antalgic gait, limping on the left side, and that he had crepitus of range of motion and atrophy of the left vastus medialis muscle. (Tr. 238.) McMurray Sign, Apley Grinder Signs and Anterior Drawer Sign tests were positive. (Tr. 238.) It was Dr. Shapiro's clinical impression that Plaintiff suffered from internal derangement of the left knee and lumbosacral radiculopathy. (Tr. 238.) Plaintiff was referred for electromyography and nerve conduction

studies, which were performed on January 24, 2011, revealing L4-L5 radiculopathy on the right side. (Tr. 238, 244.) Pelvic traction and trigger point injections were recommended. (Tr. 244.)

Plaintiff returned to Dr. Goldstein on March 9, 2011 for a follow up appointment. (Tr. 227-28.) He complained of problems with his back, right knee and left knee. (Tr. 227.) He described his pain as burning, radiating, sharp, shooting, stabbing and throbbing, and he ranked the severity of his pain as an eight on a scale from zero to ten. (Tr. 227.) It was noted that Plaintiff, *inter alia*, went for physical therapy, had tried Vicoden, and had received Supartz injections that were unsuccessful in improving his condition. (Tr. 227.) It was also noted that Plaintiff's problem had been present for six years. (Tr. 227.) Plaintiff was diagnosed with degenerative disc disease of the lumbar, lumbar herniated nucleus pulposus, knee pain, a limp, lumbago, lumbar sprain, osteoarthritis of the knee, pelvic sprain, sciatica, and trigger point with back pain. (Tr. 228.) It was recommended that Plaintiff exercise caution with activity, and Plaintiff was prescribed Vicodin. (Tr. 228.)

Dr. Shapiro reevaluated Plaintiff on March 23, 2011. (Tr. 237.) A physical examination showed that Plaintiff had an antalgic gait with a limp on the left, a bowed left knee, an abnormal wear pattern on his left shoe, and that his right hip and shoulder were higher than his left hip and shoulder. (Tr. 237.) In addition, it was noted that Plaintiff's left knee and both hamstrings and quadriceps were weak, and there was crepitus of range of motion. (Tr. 237.) McMurray Sign test results were positive. (Tr. 237.) Plaintiff's neck musculature was weak. (Tr. 237.) He failed the Krause Weber tests, and he had lost the normal rhythm of pelvisacral extension and bending. (Tr. 237.) The Gaenslen Sign and SI Joint Stress tests were positive. (Tr. 237.) Plaintiff was diagnosed with cervical radiculopathy, lumbosacral radiculopathy, and internal

derangement of the left knee. (Tr. 237.) Dr. Shapiro noted that Plaintiff was totally disabled and could not "be gainfully employed in any capacity in a competitive environment." (Tr. 237.)

Dr. Goldstein prepared a report on April 7, 2011, entitled "Treating Doctor's Patient Functional Assessment to do Sedentary Work," which indicated that Plaintiff could stand and/or walk for less than two hours during an eight hour work day; sit for less than four hours during an eight hour work day; lift and/or carry more than five pounds, but less than ten pounds, for one-third of an eight hour work day; and lift and/or carry less than five pounds for up to two-thirds of an eight hour work day. (Tr. 225-26.) Dr. Goldstein additionally reported that Plaintiff would require periods of bed rest and frequent breaks during the work day, two or more sick days each month, and that Plaintiff needed medication which would interfere with his ability to work. (Tr. 226.) Dr. Goldstein's report stated that it applied for the time period of December 2007 through the date of the report. (Tr. 225.)

Dr. Shapiro also prepared a report, dated May 4, 2011, which noted that Plaintiff had sustained two injuries to his knee in the line of duty as a firefighter, and subsequently underwent arthroscopic surgery in 1999. (Tr. 253.) Dr. Shapiro reported that Plaintiff had asymmetric left foraminal disc bulging and bony ridging which likely resulted in impingement upon the left existing L5 nerve root at L5-S1 without compression, as well as right foraminal herniation at L4-L5 encroaching on the right exiting L4 nerve root. (Tr. 253.) Moreover, it was noted that Plaintiff had L4-L5 radiculopathy on the right side. (Tr. 253.) Dr. Shapiro reiterated his findings upon his initial physical examination of Plaintiff, as well as his most recent examination of Plaintiff on March 23, 2011. (Tr. 253-54.) Dr. Shapiro's clinical impression of Plaintiff consisted of cervical radiculopathy, lumbosacral radiculopathy, and internal derangement of the

left knee. (Tr. 255.) Moreover, Dr. Shapiro reported that Plaintiff was totally disabled and could not be gainfully employed. (Tr. 255.)

Dr. Goldstein prepared another report, dated May 9, 2011, which summarized Plaintiff's appointments at OCOA, and diagnosed Plaintiff with: left knee osteoarthritis, internal derangement, contracture and pain; lumbosacral herniated disc; degenerative disc disease; sciatica; trigger point with back pain; myofascitis; and a limp. (Tr. 249-51.) The report concluded that Plaintiff had "significant orthopedic pathology," continuing pain, restricted range of motion, weakness and significant difficulty with the activities of daily living because of his left knee. (Tr. 251.) Dr. Goldstein reported that Plaintiff had "significant arthritic changes," "very restricted range of motion," and atrophy in his quadriceps. (Tr. 251.) Additionally, it was observed that Plaintiff had progressive pain in his back. (Tr. 251.) According to Dr. Goldstein, Plaintiff would continue to need orthopedic treatment and would eventually require a total knee replacement of his left knee. (Tr. 251.) Permanent changes were noted in Plaintiff's knee and back, and Plaintiff was labeled permanently disabled. (Tr. 251.)

### DISCUSSION

### I.   Legal Standards

#### A.   Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citation and internal quotation marks omitted). "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.' " *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and, thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). Therefore, the only issue before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77 (citation and internal quotation marks omitted).

### B. *Eligibility for Disability Benefits*

To be eligible for disability benefits under the SSA, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers

13

such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (alterations in the original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curium)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

### C. *The Treating Physician Rule*

Social Security regulations require that the medical opinion of an applicant's treating physician receive "controlling weight" as long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2); *see also Rosa*, 168 F.3d at 78-79. The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32. If the ALJ determines not to give the treating physician's opinion controlling weight, he or she "must consider various 'factors' to determine how much weight to give to the opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)).[2] These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and

---

[2] Since the Second Circuit decided *Halloran*, the Social Securities Regulations have been amended. At the time *Halloran* was written, the language cited here was found at 20 C.F.R. § 404.1527(d).

(5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i-ii) & (c)(3-6); *see also Halloran*, 362 F.3d at 32. Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2). Even if the ALJ commits error in discounting the treating physician's opinion, "where application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration." *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003); *see also Rivera v. Sullivan*, 923 F.2d 964, 968-69 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,' " even if the claimant is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("It is the ALJ's duty to investigate and develop the facts and develop the arguments both

for and against the granting of benefits.") (internal quotation marks and alteration omitted),
*amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty
requires the Commissioner to "develop the claimant's medical history for at least a twelve-month
period." *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012) (citing 42
U.S.C. § 423(d)(5)(b); 20 C.F.R. § 404.1512(d)), report and recommendation adopted, 2012 WL
6621722 (S.D.N.Y. Dec. 19, 2012). The Commissioner may do this by "issu[ing] [subpoenas]
requiring the attendance and testimony of witnesses and the production of any [relevant]
evidence." 42 U.S.C. § 405(d). If the information obtained from the claimant's medical sources
is not sufficient to make a disability determination, or the Commissioner is unable to seek
clarification from treating sources, the Commissioner may ask the claimant to attend one or more
consultative evaluations. 20 C.F.R. § 404.1512(e).

**II.     *The ALJ's Decision***

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of
Title II of the SSA. (Tr. 13.) Applying the five-step analysis enumerated in 20 C.F.R. §
404.1520, the ALJ found that Plaintiff satisfied the first two steps, namely: (1) Plaintiff had not
engaged in substantial gainful activity during the period from his alleged onset date through his
date last insured, i.e., December 30, 2007 through June 30, 2009; and (2) Plaintiff's chronic left
knee internal derangement constituted a severe impairment. (Tr. 13.) The ALJ concluded at the
third step, however, that Plaintiff's impairment did not meet or equal one of the listed
impairments in Appendix 1, Subpart P, Part 404 of the Regulations. (Tr. 13.)

Next, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to
perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(b), because "in an
8-hour workday, [Plaintiff] could sit up to 6 hours, stand/walk up to 2 hours and lift/carry up to

10 pounds occasionally." (Tr. 14.) The ALJ cited a lack of probative contemporaneous medical evidence for the relevant time period to support Plaintiff's claim of disability. (Tr. 14-15.) Specifically, the ALJ discounted a report prepared by Dr. Shapiro on May 4, 2011, which stated that Plaintiff "was totally disabled and unable to be gainfully employed," because the report was prepared "long after the expiration of [Plaintiff's] insured status on June 30, 2009," and the MRI of the lumbar spine and ENG/NCV studies discussed in the report "were performed well after the date last insured." (Tr. 14.) Similarly, the ALJ discounted an assessment made by Dr. Goldstein on April 7, 2011, which opined that, as of December 2007, Plaintiff "could sit less than four hours and walk/stand less than two hours during a workday, and lift/carry more than five but less than 10 pounds," because "there [wa]s no objective medical evidence to support Dr. Goldstein's opinion that the . . . assessment applie[d] [to the relevant time period]." (Tr. 14.) The ALJ gave "little weight" to a June 4, 2008 report made by Dr. Sengstock because he did not explain what he meant by his indication that Plaintiff was partially disabled, and because "a report from a chiropractor does not constitute evidence from 'an acceptable medical source.' " (Tr. 14.) In addition, the ALJ did not find support for Plaintiff's claim in massage therapy notes from 2008, MRIs of the left elbow, cervical spine, and left shoulder performed in 2008, an MRI of the lumbar spine performed in 2010, or records of Plaintiff's left knee surgery in 1998. (Tr. 14-15.)

The ALJ determined that Plaintiff "was presumably prevented from performing past relevant, very heavy[] work as a firefighter," and "while his job as an owner operator of a bar/restaurant may not [have] constitute[d] past relevant work due to earnings below the substantial gainful level . . . , he [wa]s found to have been incapable of performing that work . . . ." (Tr. 16.) The ALJ finally decided that, "[b]ased on a residual functional capacity for sedentary work, the claimant's age . . . , education . . . and a history of semiskilled to skilled

work with no skills transferable to sedentary jobs," Plaintiff was "not disabled." (Tr. 16.)

### III. *The Parties' Arguments*

Plaintiff argues that the ALJ's decision was erroneous for two reasons. First, Plaintiff argues that the record is undeveloped because it lacks specific information regarding his activities of daily living and the extent to which his impairments interfered with those activities. (Pl.'s Mem. at 14-17.) In this regard, Plaintiff claims that an activities of daily living ("ADL") questionnaire or function report was sent by the SSA to an incorrect address, rather than to Plaintiff's address, and, consequently, was not completed by Plaintiff. Plaintiff further argues that the ALJ failed to remedy this claimed error as he did not inquire about Plaintiff's daily activities or knee impairment at the hearing. (*Id.* at 15.) Second, Plaintiff asserts that the evidence in the record in fact supports his claim of disability, particularly the reports provided by Drs. Keefer, Shapiro and Goldstein. (*Id.* at 18-20.)

In response to Plaintiff's arguments, the Commissioner contends that although the record does not contain extensive medical evidence for the relevant period, it nevertheless contains all of the available evidence. (Def.'s Reply at 1.) According to the Commissioner, other than the treatment Plaintiff reportedly received from Mercy and Bellevue hospitals in the late 1990s, Plaintiff did not report receiving any treatment until he saw Drs. Goldstein, Shapiro, Keifer and Mallen subsequent to his date last insured. (*Id.*) In addition, the Commissioner asserts that, despite Plaintiff's report regarding said lack of treatment during the relevant period, the ALJ nonetheless obtained records from Dr. Sengstock, which, notably, indicated that Plaintiff had not been receiving any other treatment. (*Id.* at 1-2.)

The Commissioner also contends that an ADL function report is not required in every case, and the ALJ was not required to obtain an ADL function report from Plaintiff at the hearing

stage considering that Plaintiff's hearing was conducted two years after his date last insured, and a function report is supposed to address a claimant's current functioning. (*Id.* at 2.)

Moreover, the Commissioner asserts that the ALJ correctly determined that Plaintiff could perform sedentary work because Plaintiff's disability claim was premised only upon his left knee impairment, and his evidence that his alleged knee impairment reached a disabling severity did not pertain to the relevant time period, but, rather, related to the time period after his date last insured. (Def.'s Mem. at 11.) In addition, the Commissioner argues that the ALJ properly weighed the evidence because: Dr. Sengstock, as a chiropractor, was not an acceptable treating medical source whose opinion was entitled to deference under 20 C.F.R. §§ 404.1502 and 404.1527 (Def.'s Mem. at 12); the ALJ was not required to give "any special significance" to Dr. Goldstein's 2010 functional assessment that Plaintiff was unable to perform sedentary work since December 2007 as "the final responsibility for deciding those issues is reserved to the Commissioner," and Dr. Goldstein's opinion, which was based upon Plaintiff's lower back impairment rather than his left knee impairment, failed to provide any clinical findings (*id.*); Plaintiff told Dr. Sengstock in June 2008 that he had been asymptomatic until a recent motor vehicle accident, and he did not report having any left knee pain (*id.* at 12-13); Plaintiff's statements and claimed symptoms, which are unsupported by medical and laboratory findings, do not have to be credited (*id.* at 13); and the ALJ can find the fact that the Plaintiff failed to seek treatment for his alleged disabling knee pain during the relevant time period to be significant (*id.*).

## IV. *Application of the Governing Law to the Present Facts*

In this case, the Court agrees with Plaintiff that the ALJ had an affirmative duty to develop the record, but failed to discharge that duty. Initially, it is undisputed that Plaintiff did

not receive the ADL function report that was mailed to the wrong address, but which was intended to be received and completed by Plaintiff. Moreover, it is undisputed that Plaintiff was not called upon to testify during his hearing, much less with respect to his subjective complaints or his functional capacity. *See Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010) ("The ALJ's duty to develop the administrative record encompasses . . . the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."). Thus, the ALJ did not perform his duty of adequately questioning Plaintiff about his impairments and their effects on his functional capacity.

Furthermore, in assessing the credibility of Plaintiff's subjective complaints, the ALJ discredited Plaintiff's claimed symptoms as unsupported by medical evidence. (Tr. 15.) Here, too, the ALJ erred as an "ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Gantt v. Chater*, 1996 WL 1088910, at *4 (E.D.N.Y. June 24, 1996) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *accord Corral v. Chater*, 1996 WL 1088928, at *4 (E.D.N.Y. May 23, 1996). The ALJ correctly observed that he was required to perform a two-step process consisting of (1) considering whether Plaintiff's "impairments could 'reasonably be expected to produce [his] symptoms' "; and (2) "evaluating the extent to which [Plaintiff's] symptoms were 'consistent' with the rest of the record." *Yu v. Astrue*, 963 F. Supp. 2d. 201, 217 (E.D.N.Y. 2013) (quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam)). As to the first step, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 15.) In evaluating the second step, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these

symptoms on or prior to the expiration of insured status on June 30, 2009 [we]re not persuasive to the extent they [we]re not supported by medical evidence prior to that date." (Tr. 15.) Nevertheless, where "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," objective medical evidence is only one factor to consider, in addition to:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual received or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Sarchese v. Barnhart*, 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (internal quotation marks omitted) (citing 20 C.F.R. § 404.1529(c)); *see also Felder v. Astrue*, 2012 WL 3993594, at *14 (E.D.N.Y. Sept. 11, 2012) (stating that "[w]here the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ must evaluate the claimant's testimony in light of [the] seven factors [set forth in 20 C.F.R. § 404.1529(c)(3)(i)-(vii)]").[3] The ALJ's analysis of Plaintiff's claimed symptoms in this case failed to address these seven factors. In fact, even though the ALJ recognized that "whenever statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record" (Tr. 15), he nonetheless inappropriately

---

[3] In addition, if the ALJ rejects the plaintiff's testimony upon an evaluation of the objective medical evidence and the seven factors, he must then explain his determination "with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Felder*, 2012 WL 3993594, at *14 (citation and internal quotation marks omitted).

focused on the absence of medical evidence in reaching his decision. *See Jackson v. Astrue*, 2010 WL 3777732, at *5 (E.D.N.Y. Sept. 21, 2010) ("[T]he ALJ . . . inappropriately relied upon the absence of objective medical findings[] in being dismissive of [the plaintiff's] testimony about the pain she experienced from her fibromyalgia, as well as the symptoms of her depression."); *Caffrey v. Astrue*, 2009 WL 1953008, at *6 (S.D.N.Y. July 6, 2009) (finding that the ALJ "commit[ted] legal error" by "consider[ing] *only* whether [the plaintiff's] allegations [about his symptoms] [we]re supported by objective medical evidence"); *see also Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (recognizing that "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence" (citations omitted)). The ALJ's credibility determination was further lacking as it did not contemplate Plaintiff's work history. *See Felder*, 2012 WL 3993594, at *16 ("The Second Circuit recognizes that a good work history may be deemed probative of credibility." (citations and internal quotation marks omitted)).

Moreover, the ALJ erred in reaching an RFC determination despite having found that there was an absence of probative medical evidence. *See Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) ("[S]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." (citations and internal quotation marks omitted)); *Felder*, 2012 WL 3993594, at *13 ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of a supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citation omitted)); *Quinones v. Sec'y of Dep't of Health & Human Servs.*, 567 F. Supp. 188, 192 (E.D.N.Y. 1983) ("In this case, there is no medical evidence in the record at all as to plaintiff's

physical capabilities, and it is well-settled that the ALJ may not substitute his opinion in place of objective medical evidence." (citing *Eiden v. Sec'y of Dep't of Health, Educ. & Welfare*, 616 F.2d 63 (2d Cir.1980))). "Indeed, district courts within this Circuit have 'routinely recognized that ALJs have an affirmative duty to request medical source statements from a plaintiff's treating sources in order to develop the record, regardless of whether a plaintiff's medical record otherwise appears complete.'" *La Venture v. Colvin*, 2014 WL 1123622, at *5 (N.D.N.Y. March 20, 2014) (quoting *Battaglia v. Astrue*, 2012 WL 1940851, at *7 (E.D.N.Y. May 29, 2012)) (additional citations omitted).

While it is true that, in some circumstances, an ALJ may find that a claimant's failure to obtain medical treatment during the relevant period undermines his claim of total disability, *see Navan v. Astrue*, 303 F. App'x 18, 20 (2d Cir. 2008) (citing *Arnone v. Bowen*, 882 F.2d 34, 30 (2d Cir. 1980)), it is also true that "where there is evidence of the severity of an impairment during the period shortly after the relevant time period, such evidence strongly supports a conclusion that the very same impairment was disabling during the relevant time period." *Carr v. Colvin*, 2014 WL 1239163, at *6 (N.D.N.Y. March 25, 2014) (citing *Reyes v. Barnhart*, 226 F. Supp. 2d 523, 530 (S.D.N.Y. 2002)); *see also Eiden*, 616 F.2d at 65 ("[E]vidence bearing upon an applicant's condition subsequent to the date [of eligibility] is pertinent evidence in that it may disclose the severity and continuity of impairments existing before" (alteration in original) (quoting *Gold v. Sec'y. of Health, Ed. & Welfare*, 463 F.2d 38, 41-42 (2d Cir. 1972)) (internal quotation marks omitted)). In this case, Plaintiff visited Dr. Keefer approximately three months after the date last insured, and Dr. Keefer's examination of Plaintiff's left knee revealed crepitation, mild effusion, instability to varus stressing and medial joint line tenderness. (Tr. 205-06.) In addition, an x-ray of Plaintiff's left knee showed degenerative change. (Tr. 206.)

Plaintiff was diagnosed with left knee pain and osteoarthritis. (Tr. 206.) Similarly, an examination of Plaintiff's left knee performed by Dr. Shapiro in March 2010, approximately nine months after the date last insured, revealed, *inter alia*, that Plaintiff ambulated with an antalgic gait, was limping on the left side, had difficulty walking heel to toe and tandem walking, that Plaintiff's left knee was swollen, and that there was some atrophy of Plaintiff's left knee's vastus medialis muscle. (Tr. 241.) Thus, although the opinions of Drs. Shapiro and Keefer did not specifically provide that they were applicable to the relevant period, they nonetheless bore on the relevant period because they indicated that Plaintiff suffered from severe and continuing impairment of his left knee. (Tr. 14.)

Even if the ALJ were correct in disregarding the opinions of Drs. Shapiro and Keefer because they did not refer to the relevant period, the ALJ erred in summarily disregarding Dr. Goldstein's April 2011 retrospective opinion, i.e., as of December 2007, Plaintiff "could sit less than 4 hours and stand/walk less than 2 hours during an 8-hour workday and lift/carry more than 5 but less than 10 pounds," on the basis that Dr. Goldstein did not start treating Plaintiff for his knee until February 25, 2010, nearly eight months after the date last insured. (Tr. 14.) Although Dr. Goldstein began treating Plaintiff after the date last insured, his retrospective opinion should nevertheless have been afforded significant weight by the ALJ in the absence of contradictory medical evidence or overwhelmingly compelling non-medical evidence. *See Byam*, 336 F.3d at 183 (observing that retrospective diagnoses are to be given controlling weight where there is no contradictory medical evidence or " 'overwhelmingly compelling' non-medical evidence" (citation omitted)); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) ("While Dr. Sanfacon did not treat the appellant during the relevant period . . . , his opinion is still entitled to significant weight."). Indeed, "a diagnosis of a claimant's condition may properly be made even several

years after the actual onset of the impairment." *Dousewicz*, 646 F.2d at 774 (citations and internal quotation marks omitted). Here, Dr. Goldstein's opinion appears to be supported by the medical evidence relating to Plaintiff's left knee condition prior and subsequent to the relevant time period, and there is no evidence in the record which plainly contradicts Dr. Goldstein's retrospective opinion. Although the Commissioner points out that when Plaintiff saw his chiropractor, Dr. Sengstock, in June 2008 for neck, shoulder and upper back problems following a motor vehicle accident that had occurred in 2008, Plaintiff reported that he had been asymptomatic until said accident (Def.'s Mem. at 12-13), this evidence does not clearly contradict Dr. Goldstein's opinion considering that Plaintiff was seeking treatment for new injuries, and his statement about being previously asymptomatic presumably was made with regard to the condition of his neck, shoulder and upper back prior to the accident for which he was then seeking treatment. At the very least, clarification should have been sought from Dr. Sengstock or Plaintiff as to whether Plaintiff's statement about being asymptomatic was issued with regard to only his neck, shoulder and upper back, or, instead, his overall condition.

The ALJ also erred in discrediting Dr. Goldstein's opinion on the basis that there was "no objective medical evidence to support Dr. Goldstein's opinion that [his] assessment appli[ed] prior to September 23, 2009 and certainly not all the way back to December 2007." (R. 14.) As previously noted, a "treating physician's opinion as to [a] claimant's disability is controlling if it is well supported by medically acceptable clinical and laboratory diagnostic techniques, an[d] is not inconsistent with the other substantial evidence in the record." *Saviano v. Chater*, 956 F. Supp. 1061, 1069 (E.D.N.Y. 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998). Moreover, "[e]ven if the treating physician's opinion is retrospective, it will be binding unless contradicted by other medical evidence or by 'overwhelmingly compelling' non-medical evidence." *Id.* (citations

omitted). In this case, Dr. Goldstein's diagnosis of Plaintiff's sedentary capacity was reached after Dr. Goldstein had conducted several prior examinations of Plaintiff's knee, which examinations revealed, *inter alia*, mild quad and calf atrophy, an active range of motion from five to eighty degrees, and tenderness of the patella and medial joint line. (Tr. 202.) In addition, prior testing of Plaintiff's knee by Dr. Goldstein revealed positive results for patella grinding and crepitus with ROM, and McMurray testing was positive. (Tr. 202, 228.) While it is true that Dr. Goldstein's April 2011 functional assessment of Plaintiff's capacity to do sedentary work indicated that that the diagnostic and clinical findings supporting the opinion related to Plaintiff's back conditions, rather than Plaintiff's left knee condition (Tr. 226), considering the somewhat extensive treatment of Plaintiff's left knee by Dr. Goldstein, and considering that an ALJ has a duty to develop the record, the ALJ should have sought clarification from Dr. Goldstein about the extent to which his opinion regarding Plaintiff's capacity to do sedentary work may have been based upon Plaintiff's left knee condition.

## *CONCLUSION*

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted. Accordingly, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision is reversed and the instant action is remanded for additional proceedings consistent with this opinion. Specifically, the ALJ is directed to: (i) develop the record so as to adequately determine Plaintiff's RFC, including adequately questioning Plaintiff about his impairments and their effects on his functioning capacity; (ii) thoroughly assess Plaintiff's credibility by addressing all of the relevant factors and considering the entire administrative record; and (iii) consider the medical evidence of Plaintiff's condition subsequent to the date of eligibility and give appropriate weight to the retrospective opinions of Plaintiff's treating physicians.

**SO ORDERED.**

Dated: Central Islip, New York
      December 4, 2014

                                    /s/
                                Denis R. Hurley
                                United States Senior District Judge